Judge, for the final case under Dr. Smolnik's suit at 24-0494, people of the State of Toronto, I'm to call on the PM, Mr. Mark Holmes, and Mr. Kennedy to come forward. Arguing on behalf of the appellant, Ms. Annie Segalski. Arguing on behalf of the appellee, Ms. Gabrielle Moore. The microphone is needed. Everyone should, but not everyone does. So I appreciate that. So please proceed. Good morning, Your Honours. Opposing counsel, may it please the Court. My name is Annie Segalski from the Office of the State Appellate Defender, representing defendant appellant, Mr. Dionne Holmes. Throughout the proceedings against Mr. Holmes, the State didn't ask, is it constitutional? It simply asked, is it close enough? To the State, offering a surrogate witness who was not present during any of the relevant portions of the testing was close enough to give Mr. Holmes the opportunity for cross-examination. A mere hunch was close enough to pull Mr. Holmes over, despite him having two clearly working headlights. Charging Mr. Holmes with the wrong statute was close enough, even though the one they charged him with had one fewer element than the correct subsection. And giving jury instructions that were erroneous was close enough to decide Mr. Holmes' guilt. Your Honours, there's no close enough to constitutional. Mr. Holmes raised four issues in his brief. Today I would like to focus on three, confrontation, suppression, and the reasonable doubt argument. The State does not challenge that the statements in the forensics report were either hearsay or testimonial. Therefore, the only issue for Your Honours to decide today is whether or not Mr. Holmes had a prior opportunity to cross-examine the unavailable declarant. He did not. And the testimony of Rhonda Earle did nothing to cure that violation of the confrontation clause. Even though Rhonda Earle was in the same lab as the original analyst, she was not present. She doesn't recall being present for any of the testing, any of the actual processes for when the analyst, Scalise, ran the tests on the substance. Even though she was his supervisor, she did not see the substance leave the bag. She did not see the substance be put into the machine. She wasn't there to see whether or not anything might have gone wrong. Well, if she did peer review, and I'm not sure this is covered in her testimony very clearly, if she had decided as a result of that review that something didn't appear right or didn't look right, would the gentleman who died, and I can never remember his name, would he have had to redo it? Or does her peer review and apparently saying, okay, okay, whatever the sheet looks like, that she acknowledges that she's reviewed it, does that simply indicate that she believes that he has, he is correct in his analysis and in his holding? In the peer review document, she did indicate that she believed everything was correct, but that does not do anything to cure the fact that Mr. Holmes wasn't able to cross-examine the actual analyst who was there that day. Earl simply just did not have the personal knowledge to be able to testify to what did or didn't happen. A simple example from everyday life is a server can look at a dish coming out the kitchen and say, this looks relatively correct. It has all the ingredients that need to be there. However, the server could not tell you whether the cook spit in the food. That's what we're concerned about here with the confrontation clause. That's what we're concerned about because defendants need the opportunity to be able to question the actual analyst to see if there was any switch-up with the substance, to see if maybe a vial was dropped, contamination, anything to be able to test the credibility and the actual events of the day when it was tested. All right. The usefulness of this particular item, this report, that ultimately comes in in some other way is that the substance is, in fact, marijuana, correct? The report did come back in that it came back as positive for cannabis. However, the actual report would not have been admissible because it is hearsay and it does not fall under the business records exception because it was made for litigation. I know that. It was made for litigation. But then if that's its importance, if that's what it says for marijuana, cannabis, wasn't there testimony from the officer and wasn't there an admission by your client that, in fact, he had used and that it was marijuana and that the officer smelled what he believed to be marijuana? He didn't even say what he believed to be. He said, I smelled it and I have experience. So what does this document do that hasn't already been done by other testimony? Yes, Your Honor, the officer did testify to smelling cannabis. However, and my client did confess that he had a blunt. However, under corpus delicti, a confession alone is not enough. And although there was testimony for the – We have something other than a confession. We have the item. He gives it to him in a bag. So it's not like, well, I did do that, and here's what I did it with. That's more than a confession. Yes, but under People v. Park, which was decided by the Illinois Supreme Court, an officer's testimony based on his experience that the look, touch, feel of a substance appears to be cannabis is not enough to corroborate a confession. But he said, I used this blunt, or this is the blunt I used. What is that? I mean, he's saying he used it, and now we can see it. Well, he said that it was a blunt. Again, the testimony of the officer is not enough to corroborate it beyond a reasonable doubt for a conviction. That he – that the defendant has admitted this to him is not – and provided the physical object is not enough is what you're saying? Yes. Okay. To that point about the physical evidence, too, they did discuss in People v. Park how cannabis is a substance where it can look, smell, feel like other substances, such as hemp, which is legal. And that is also a reason why an officer or even the – Mr. Holmes, my client, might not be able to testify beyond – to testify conclusively to the identity of the substance. Did he think he was using hemp? There's no testimony as to whether or not he actually smoked the blunt. He received the blunt for his birthday. And in People v. Park, while the court said they did have enough evidence to be able to prove that the defendant thought that it was cannabis, that isn't what we're here to prove today, and that's not what we were here to prove against Mr. Holmes. Okay. was because the state needs to prove that this was harmless beyond a reasonable doubt, meaning that there is no reasonable probability that it contributed to the jury verdict. And we do not think that they can hold that burden. The state used the conclusions of the report in its closing saying, you heard that the colleague of 24 years told you about the work that Scalsi did and that the result was, in fact, marijuana. And this was a jury trial. And even in People v. Williams, which was overruled by Arizona v. Smith, they did say in dicta that this was a bench trial in Williams. It might be different in a jury trial because jurors don't exactly know always how to parse together what is coming in for the truth of the matter asserted and what is simply an opinion. Therefore, we hold that or we posit that the error of admitting the report and admitting the conclusions of the report via the surrogate witness, Rhonda Earle, were not harmless beyond a reasonable doubt and did contribute to the jury verdict. Moving on to the motion to suppress. In this case, the suspicion that the right headlight was out was not reasonable. The officer was very clear about what the suspicion was. He testified nine times that it was the right headlight was out. In the video, throughout the video, he repeatedly mentions the headlight, no parking lights. Now, whether or not the suspicion is reasonable is based on the circumstances that the officer can see. And in this case, we do have those circumstances to view ourselves in the video. And the video shows two clearly working headlights throughout the entire minute that the officer followed my client, Mr. Holmes, without pulling him over. And in this case, even if maybe he thought the headlight was out, a reasonable officer on a dark road, where they're the only ones on that road for the majority of the time, would look and see that the headlights were working. Therefore, that suspicion that they had was unreasonable and should not have led to a stop. We don't, or do we, have any video or body cam of the initial view of that particular car on the highway? No, Your Honor, but the testimony of the officer was right headlight. And the officer didn't testify to a flickering on of the headlights, as if he pulled out and turned things on. And even if we go with the parking light theory, which only occurred almost four years later at trial, you can't turn one headlight on, one headlight off. You can't have both parking lights on, and then the officer, who it's dark out, looks and says, only the right headlight is out. That's just not a reasonable belief. But I thought the problem was that when it was actually tested, your client said, no, my headlights work, and so it was tested, and then they did work. But that's not the time at which the determination of reasonableness is made. The time is in the initial observation of the vehicle. What did the officer see? And he said he saw the right headlight maybe flickered or was not on. And so it could have hit a short. It could have hit a bump. I lose communication skills or communication on my cell phone every time I hit a bump, and lots of people in this courtroom could tell you that. So, I mean, there are all sorts of things that could have happened between the time he saw it, they stopped, and they tested it. But the case law is quite clear that the time for reasonableness of the officer's action is at the time of initial observation. Isn't that correct? That's correct, Your Honor. But what is also part of the case law is that that reasonable suspicion can dissipate. An officer cannot have reasonable suspicion and then wait to act on it and let it dissipate because a reasonable officer would have looked as Mr. Holmes was driving and saw both headlights working. So even if there was that initial suspicion that the right headlight was out, he should have seen that, no, the headlights are working and then gone on their way. This would be a different case if he had pulled them over right away before he had any chance to see whether or not Mr. Holmes's lights were working. But this is a case where the officer then followed him down a dark road. And if you, Your Honors, have seen the video, you can see both the headlights illuminating the ground in front of the car and followed him for a minute, saw him turn. And there's just no way that a reasonable officer would have closed his eyes to the fact that both headlights were working. May I ask, was there testimony from the police officer, is it Wilk? Yes. That it flickered? No. I'm wondering, though, perhaps you're right. The headlights were on, but he made a, is it possible he made a reasonable mistake of fact? And if so, then isn't that a rule that a reasonable mistake of fact and a Terry stop is still going to kind of be forgiven in terms of justifying that brief intervention? Yes, you can have a reasonable mistake of fact as an officer, but this was the case again. I think the video kind of... The video would have offset, and also the fact that he followed him without pulling him over. If he had an honest belief that the right headlight was out, he wouldn't have followed him for a minute down the street, down the dark road. Ultimately, though, the question is whether counsel is ineffective or... Yes. And I guess I wonder if, you know, the likelihood was such that nobody would have not brought the motion. So in this case, the attorney did not bring the motion. But why they didn't file, I believe that there was many different attorneys on this case. May I finish? There are many different attorneys on this case. It took nearly four years to get to trial. I do believe that they're not... I don't want to speculate too much, but they changed in January 9th, 2020. There was at least four other attorneys. And she did try to cross on the stop during the testimony and was asking, are you sure you saw the lights? But what about that part where... So the only part where the headlight wasn't on was the part that wasn't captured. So she was trying to cross on it, and it would have been way more effective in a motion to suppress, where she could actually then suppress the evidence for a client versus then this was a cross on credibility, and it didn't have the effect. Any other questions? All right, counsel, you will have time to move on. Counsel, I believe you may proceed when ready. And feel free to adjust the microphone. Good morning, Justices. Counsel, may it please the Court. My name is Gabrielle Nguyen. I represent the people of the state of Illinois. The people want to set out their position on the four issues, and then we'll go straight to the first one, if you'll allow us to. It is the people's position that where the analyst died, it was proper for Rhonda Earle, the peer reviewer, to testify as an expert to the findings of the report. However, if this Court finds error, it was harmless and invited by the defendant when he declined the opportunity for the substance to be retested prior to the start of trial. As to the second issue, the people proved defendant guilty of criminal damage to property beyond reasonable doubt when defendant caused the damage by knowingly urinating on the furnace inside of the police station. As to the third issue, trial counsel was not ineffective for not challenging evidence collected during a lawful traffic stop where the officer did have reasonable suspicion. And lastly, as to the fourth issue, the jury instructions for unlawful possession of cannabis were adequate to convict defendant. However, if there were any error, the defendant invited and forfeited any claim of error as to jury instructions, and any purported error would be harmless. Now, as to the first issue, I do want to address, Justice Hutchinson's question about the evidence that was available to find defendant guilty for the charged offense. So the facts in this case was that the officer smelled the cannabis coming from defendant's vehicle. The officer smelled cannabis coming from defendant's person. The defendant admitted to smoking a blunt with family. He turned over the cannabis in a clear plastic baggie. The officer, based on his experience and skills, was able to identify the substance as cannabis. The cannabis was not in a proper container that was compliant with the statute. It was in a clear plastic baggie, so it wasn't odor-proof. And the picture of the cannabis in the baggie was submitted as an exhibit, admitted as an exhibit, and it was presented to the jury. So there was a substantial amount of evidence that was able to support a conviction for defendant for the unlawful possession of cannabis. What about the argument that this jury trial and the additional evidence being presented through the testimony of Ms. Earle was a factor, at the very least? Ms. Earle's testimony was submitted to speak on the report that was submitted as to what the substance was, but absent her testimony, the jury was still able to come to the same conclusion that they reached, that because of the substantial amount of circumstantial evidence available, that the defendant was guilty of possession of cannabis, unlawful possession of cannabis. In Ms. Earle's testimony, she wasn't just an unconnected analyst in the lab. She was connected to the process that was used to determine the substance to be cannabis. The initial analyst did test the substance. Rhonda Earle was the peer reviewer, and she had to take the findings from the report, the substance that it was, compare it and make sure that the findings aligned up with what the substance presented to the lab was. And her role in that was to finalize. There wouldn't have been a finalized report without her contribution. She was an extremely integral part of the process. But as to Scalise's report, a lot of her testimony from the transcript was, and I was looking for it, I don't have it immediately in front of me, but a lot of it was, I assume, typically, generally, this is what happens. She didn't have any personal knowledge of the chain of custody, for example, or the testing that Scalise actually conducted. On the item, did she? So the knowledge that she did have, based on the personal knowledge, was your question, Justice Kennedy, that she did have is that she was able to identify, from her own knowledge, the markings by Scalise, the analyst, the agency, the evidence, the lab and the cannabis exhibit. So she was able, to a degree, to testify to the chain of custody. And as to the specific test that she mentioned, Justice Kennedy, though she wasn't present for the specific test, she was still able to speak to the two tests that were employed to determine the substance to be cannabis. So she was able to speak to that, due to her expertise as being the analyst for 28 years. Isn't her testimony still limited to the presentation of Scalise's report, for the truth of the manner asserted in the report? Her testimony was based, you know, as an expert, and then her role in the process as a peer reviewer. To Justice Hutchinson posed a question previously that had Rhonda Earle deemed that the findings didn't match the compounds of the substance or something, to that degree, would have impacted, like, the finalized, you know, report, or would it have to be redone or something like that. And the answer is this, it just wasn't like a check mark thing, like, you know, just going through a list. She was analyzing, you know, what was being presented. So her analysis was a part of the testing process and the finalized report. She wasn't like a separate entity. Absent her contribution, there wouldn't have been any finalized findings. So she was able to speak to, this is the compound that was presented to the lab. These were the tests that were employed. These were the results that came out. These results matched the makeup of the compound. That is based on her personal knowledge, and she is able to speak to that. So I found one section of her testimony that says, as a peer reviewer, you look at the report, you look at the worksheet, you look at the notes, the data, and you verify that the data and the notes of the testing correspond to the call that's being made, the decision they're finding. So it's a different role, right? The peer reviewer is not the tester. They're just looking at consistencies on paper, essentially. It is a different role, but the two roles are still required in the finalizing of the report. There wouldn't have been, like, let's say there was no peer review done on Kelsey's report, then there wouldn't have been a finalized report to be able to be presented. So though she had a separate role, it was still an integral role, an extremely relevant role, to be able to speak to the findings, you know, that the substance was indeed cannabis. So it was integral and it was important, but in the end, does it matter? She didn't do the testing, and she couldn't testify to it. Yes, Justice Marlene, though she was integral and important, but it still mattered, because she was able to testify to the finalized results of the report. But even that testimony was equivocal. She said something like, well, based on those results, then yes, this was marijuana. But it's still, you know, my concern is it's still hearsay. It's important, it's corroborative, perhaps, but it's hearsay. You make the argument in your brief that Mr. Skelsey was unavailable, and then say, well, but we had Ms. Earle. So you seem to be concluding that that was fine. You point this out under 804, he was unavailable because he was dead. Is that all 804 requires? No, Justice Marlene, it's not. No, you also talk about a business record, but is it a business record if it's made in preparation of litigation? But it's not. And if it's testimonial, the Supreme Court has laid on this, the United States Supreme Court has laid out that if it's testimonial, then you've got to have the witness. Yes, Justice Marlene, in this case, we had that. Do you don't think it's testimonial? The report, that's testimonial, but we had Rhonda Earle, as you pointed out, that the State Attorney. He didn't do the initial testing of the specific substance, but was a part of the finalized findings of the report to determine that. She didn't do the initial testing. She didn't do any testing. She reviewed the results from the testing that Mr. Scalise had done. I don't mean to be cross, but I mean, let's be precise. She didn't do any testing. She reviewed the data and saw if it matched the conclusion. That's what she did as a peer reviewer. So she didn't do any testing. No, she did not do the testing. Thank you. Absolutely. Even aside from her testimony, this issue can be resolved if this court does find that it is error. It can be resolved on other grounds. And as I started out, harmless error. You indicated in your brief that the defense failed to make its burden on harmless error. Do you still maintain that? No. Thank you. I don't maintain that. It says burden, but we also have to overcome that. And you see that at the top of my argument, there was a substantial amount of circumstantial evidence to support the guilty finding of the defendant for possession of cannabis. And also, we did make an invited error argument. And we do want to address that here, because up until the day of trial, this issue about the disclosure of Rhonda Earle as a witness was litigated as a disclosure issue specifically to the timeliness. And just for context, Martin Kelsey died in August. They were put on notice in September. The state made a motion, didn't they? They made a motion to continue in September. It was granted, wasn't it? Yes, it was granted. I wonder if it was not retested at that time? Is there anything in the record as to why not? There is nothing in the record as to... Well, because they were securing Rhonda Earle. So in October 2023, they filed... No, it was not retested. Retested the remaining material. There isn't an explicit statement in the statement of the record as to retesting. But in October 2023, two subpoenas were filed to obtain Rhonda Earle to testify, which was in the state file. And so from at least September, the defendant was aware that someone other than Martin Kelsey was going to be testifying. And then up until the day of trial, it was litigated through their motion to bar testimony that was filed, that it was the time of the subdisclosure. But then the day of trial, for the first time, they raised a confrontation clause issue. And then in response to that, the state presented, you know, the alternative argument of Rhonda Earle could be presented as an expert witness, and or we did offer to retest the substance. And the defendant declined that offer, where the trial court was prepared to continue the trial in order to do such a thing. And we did comply by, you know, disclosing, you know, that someone else is going to be testifying. Her name was presented in the witness list that she was going to be testifying before trial. And there wasn't... Original defense counsel did file a speedy trial demand, but there was no indication, you know, in the record that it was an issue. So there's no evidence that a continuance would have violated a speedy trial issue at all. And the defendant noted in the decline to accept the retesting, continue for retesting, that it was a 2020 case. It had been, you know, four years and things like that. But as they noted, because it had been four years, a small additional delay would have been impactful at that point for them to raise that confrontation issue, the morning of trial for the first time. And so it is the people's position that, you know, where we did address the argument raised for the first time, the day of trial, that was a confrontation clause issue, and that we offer, you know, for it to be retested. And then that offer is declined, that that is invited error. So separate from a harm and sale argument that, you know, substantial, non-circumstantial evidence could have confirmed, affirmed the conviction, it was also invited. And so this case, if this court does find that this is error, can be resolved on other grounds, and we don't have to get to the constitutional issue at hand. Counsel, I want to go back to the stop briefly. I'm just reading a transcript of the officer's testimony on direct. He states, I observed the vehicle to have what appeared to be right passenger headlight out. Immediately after that, it says the vehicle was driving with its parking lights only on. On cross-examination, he testified initially when he was driving, I observed one headlight out. And then he says, I believe he turned them on after I pulled out of my position. So I guess I have two questions here. Like, first, given the inconsistencies in the statement concerning the lights, what is your burden of proving the reasonableness of this stop? So as to the officer's initial observation, as you pointed out, he did say that he believed the right passenger headlight to be out and the parking lights to be on. That was his initial reason for addressing it. And I would add on the video, he says your headlights were out. He says that several times. Yes, Justice Kennedy. And that was his initial view of defendant. And as they pointed out, like in the video, you could see lights gleaming maybe from the side, but that supported his statement that he thought there were parking lights only on. And so that speculation to say that he absolutely could have known that the headlights were working completely properly because he saw, you know, lights gleaming in the front when it could have been the parking lights on, both of which were driving violations. And so that was a reasonable basis to stop defendant. And then after that, you know, he approached, once he pulled defendant over, approached the front, saw that the headlight, you know, was properly working. That doesn't. Please continue. The fact that Officer Wilkes subsequently discovered that the headlight was properly working does not invalidate the stop in itself. It does not undermine what the reasonable suspicion was in the first place. And in this case, there was no basis to contest, you know, because per the body cam footage and testimony, his initial belief that, you know, the headlight, the passenger headlight was off or that the parking lights was on is supported or isn't undermined by the video, because the video shows gleaming lights that could have been the parking lights. So the stop was reasonable. Attaching the pictures in the defendant's brief is, you know, purely speculative. And it wasn't ineffective for counsel not to challenge, you know, the stops. And to the extent that any of those issues are of record, which people believe that it is not, it can be addressed in post-conviction. All right. Counsel, I wanted to address the criminal damage to property count. The defense argues that essentially it was not damaged. So I just wanted to get your take on it. It is the people's belief that it absolutely was damaged. The statute says a person commits criminal damage to property when he or she unknowingly damaged any property of another. Damage can include loss or injury to a personal property or any bad effect on something. And in this case, the defendant was arrested. He was placed in the interview room, left alone for three minutes, you know, approximately. So the urinating on the furnace constituted damage or harm? Yes, it did constitute damage as it pertained to, like, bad effect. The furnace had to be professionally cleaned. There was an odor that was emanating, you know, from the furnace. And that in itself is a bad effect and impedes the functionality of the furnace itself. So that does qualify as damage. Is there any threshold in terms of cost that we should be analyzing? The cost of what it, how much it, for the station to be professionally cleaned. So the cleaning is the equivalent of repair, right? That's your argument. Yes. So is there any threshold to, I mean, if the cleaning costs nothing, if it would have been done otherwise, any threshold there that we should consider? Not blatantly, just the fact that, you know, money had to be spent, you know, to repair the furnace from the bad effect that the defendant caused upon it by, you know, purposely, unknowingly. Did you have a question? I do. I have one question. Well, there are two, depending upon your first answer. In the September motion to continue, were, did the State, was the State saying we are looking for someone or we are testing or just, was it just vague, we need a continuance? To my recollection, I don't have it in front of me at this time. My apologies, Justice Hutchinson. But it was the September 2023 continuance stating that Martin Kelsey had died and that they were looking, you know, for someone else. I think, I don't believe at that time that anything more detailed than that was disclosed until, you know, October 2023 and the subpoenas got into play. Is there anything else in this particular record that tells us how long it would take to retest and get, get the whole process done as it had been done in the first situation? Nothing that was... Okay. So it, there wasn't any, anything that said it'll take us three months to get the information, it'll get, it'll take a year. Sometimes they have backups. We've heard about that during the course of other arguments that they were behind. So does this record tell us anything about the time it would take to retest this material? Based on my recollection at the, the hearing that was held before the start of trial, I believe it was six weeks, something around there. My apologies if that's not a correct recollection. That was all I had. Thank you. All right. Thank you, counsel. Thank you.  The, the, the, the, the, the, the, the, the, the, the, they, they received the substance on May 20th, 2020. And then they were able to test it on May 28th, 2020. And then it was completed by, or it said that was May 26. So, and then June 4th, 2020. So it took two days from receiving the substance to test, to begin testing. And then from there, it took six days to actually retest the substance and get the results. And that's from SCLC's report. It has the dates, what it received, et cetera, on it. Okay. So from the time that they found Ms. Earl, which was sometime in October, I think, and the trial date, which was about December 23rd, I had to try a case just before Christmas. Worst thing in the world to do. We've got about six weeks there, right? Give or take from the middle of October until the trial date? Well, he passed away in August. Right. But they didn't know where she was at that point. It looks like the state was looking for this peer reviewer. And they weren't just going to give it to anybody else who was in the particular lab. They had a plan. And so once they found her, and the question that I have is, looks like there was at least six weeks between the time they found her and the time of trial. Does the record indicate any effort was made to retest these items? There was no effort until that offered day of trial. And that was on the day of trial or on that pretrial conference a couple days earlier than that? Like on the 20th? That's true. Okay. Thank you. And then as to whether or not this was invited error, in Melendez DSV, Massachusetts, the Supreme Court said that the confrontation clause imposes a burden on the prosecution to present its witnesses, not on the defendant, to bring those adverse witnesses into court. Quite frankly, this is a case where the state could have retested, should have retested. Even under Illinois v. Williams, which was overruled, Justice Thomas, one of the people who concurred in the decision, actually did say that he was concurring because he didn't think it was testimonial, not because it should have come in. So the fact that they didn't even try to retest it when they had ample time is really, they thought that they would be able to have something close enough to giving Mr. Holmes his right to cross-examine the witness against him. And we believe that that was an error that couldn't have been invited in this case. Additionally, the error, although there was the confession and the corroboration, not the, but the testimony by the officer, this State doesn't cite any cases in which an officer's testimony was enough to corroborate the defendant's confession. And the ones that they cited to, such as Sullivan Bay, Robinson, those were actually controlled buys, where they got the people who bought the substances to then testify. In people v. Robinson, all three occurrence witnesses testified to the substance, and one of them said that he knew because of the bitter taste. We don't have that in this case. All we have is an officer saying, based on my experience in training, it was cannabis, I smelled cannabis. And that was not enough in people v. Park. It's almost exactly analogous to our case. And then as to the damage, Mr. Holdings asserts that it is not damage under 1A1, because damage through odor was supposed to be captured in 1A5, which has an additional element that the defendant must intend to interfere with the further use of the property. And that element wasn't given to the jury. That was not an element that Mr. Holdings could have defended against. And because the legislature captured harm through odor through a separate subsection with a separate element, they charged the wrong section, the state charged the wrong section that made their burden lesser when the legislature said, if you want to prove harm by odor, you have to improve the secondary intent. You have to prove that you wanted to interfere with the property. You can continue. You have to intend to interfere with the property, and to hold that damage under what was charged, 1A1, and encompass this odor, swallows the entire statute whole in that case, because all the subsections then would be any harm, as the state posits. So there's other sections, too, that couldn't possibly be part of 1A1, such as recklessly by means of fire explosive damages property of another. The legislature is ascribing different intent, different elements to different types of damage, because they're not all the same. Damage is very hard to quantify, and by charging it under 1A1, the state did not meet its burden, because that's simply not what the legislature meant by damage when it wrote that subsection. Could I push back a little bit and ask that A5, and unfortunately I didn't bring that here, but I did look at it. It says something like, by means of, does it say stink bomb? I thought that was my own little layperson's description of it. Stink bomb introduces into land or something like that, and intends some harm to come as a result of that stink. So in a way, I guess the argument could be that maybe stink bomb doesn't damage property, because it exists. It's not touching anything except, say, grass. Whereas, just to argue it fully, it could be the legislature did not necessarily intend A5 to be the exclusive means to address smell, because urine, not to get technical, but it's wet. It's on there. It's a substance. You've introduced a substance that's going to remain there. Maybe I'm overthinking it. I see that it may be the legislature did not fully intend all bad smells must be charged under A5. I have that concern. Yes, Your Honor, you do correctly recall stink bomb. But it goes on to say, or any offensive smelling compound, and thereby intends to interfere with the use of another of the land or building. If there are no further questions. All right. Thank you very much, counsel. I want to thank the attorneys. We will take this matter under advisement, issue a ruling in due course.